SEI Fuel Services, Inc,      :
                                  :
    plaintiff,               :
                                  :
v.                             :    CASE NO. 3:18-cv-1553(AWT)
                                  :
A&J Gas and Convenience, LLC.,  :
et al,                   :
    defendants.             :

## RULING ON PLAINTIFF'S APPLICATION FOR PREJUDGMENT REMEDY

The plaintiff, SEI Fuel Services, filed this breach of contract action against the defendants, A&J Gas and Convenience, LLC, Anis Ahmed M. Shaikh, Jabin A. Shaikh, Naeem Uddin, Faisal Khalid and Sana Adel, LLC.[1] On April 11, 2019, the plaintiff applied for a prejudgment remedy ("PJR"). On May 20, 2019, the defendants filed an opposition brief. On June 3, 2019, the plaintiff filed a reply brief and, on June 12, 2019, the defendants filed a sur-reply brief.

The Court held a PJR hearing on August 6, 2019. During the hearing, the defendants noted that the agreement requires the Court to apply Massachusetts law. The defendants argued that the plaintiff cannot recover lost profits under Massachusetts law. On August 22, 2019, the parties submitted briefs on the damages issue and, on August 28, 2019, the defendants submitted a reply

---

[1] The claims against Sana Adel, LLC. have been dismissed with prejudice. (Dkt. #81 and 82).

brief.  After considering the evidence, arguments and briefs,
the plaintiff's application for a prejudgment remedy is GRANTED.

## I.  **Statement of the Facts**

In addition to the evidence that was introduced during the
PJR hearing, both parties included detailed facts in their
briefs.  The Court summarizes the facts below.

On or about October 30, 2002, A&J Gas and Convenience, LLC
("A&J Gas") entered into a Branded Sales and Security Agreement
with Mutual Oil Co., Inc. (Plaintiff's Exh. 1).  The agreement
had an effective date of November 1, 2002 and related to the
sale of petroleum products at the gas station located at 202
Main Street in Southington, Connecticut. (Plaintiff's Exh. 1).
The agreement required A&J Gas to purchase petroleum products
from Mutual Oil Co., Inc. ("Mutual Oil") and operate a branded
gas station using the Citgo trademark. (Plaintiff's Exh. 1, at
p. 3).  A&J Gas' obligations under the agreement were secured by
a mortgage on the premises.  (Plaintiff's Exh. 2, p. 2 at ¶12).

On the same day that the parties entered into the Branded
Sales and Security Agreement, the parties signed an Addendum to
the agreement.  (Plaintiff's Exh. 2). The Addendum provides that
the term of the agreement is for ten years or 9,000,000 gallons
whichever comes later. (Plaintiff's Exh. 2, at ¶2).

In August of 2006, defendants Naeem Uddin and Faisal Khalid
signed an Assumption Agreement and assumed the obligations of

A&J Gas under the Branded Sales and Security Agreement.

(Plaintiff's Exh. 4). The Assumption Agreement provides that

> The supplier will continue to service the Buyer's
> location at 202 Main Street, Southington, Connecticut,
> pursuant to the Branded Sales and Security Agreement
> dated September 9, 2002 and the Addendum to the Sales
> and Security Agreement dated September 9, 2002…. The
> Buyer will be bound by and assume all responsibility
> under these agreements acknowledging that the agreements
> have an expiration date of October 31, 2012, or upon the
> purchase of 9,000,000 gallons of gasoline, whichever
> shall last occur."

(Plaintiff's Exh. 4, at ¶1). The Assumption Agreement does not

release Anis Ahmed M. Shaikh or Jabin A. Shaikh. (Plaintiff's

Exh. 4, at ¶6).[2] George Souza, who is employed by the plaintiff,

testified that, in March of 2015, Mutual Oil assigned all of its

rights and obligations for the gas station to the plaintiff, SEI

Fuel Services Inc ("SEIF"). (Plaintiff's Exh. 6).

In August 2018, the defendants attempted to de-brand the

gas station of all Citgo trademarks and stopped purchasing

petroleum products from the plaintiff. "The concept of

'debranding' essentially means taking down the logos, names and

other reference to the supplier and starting up with a new

supplier." (Dkt. #55 at 2).

---

[2] Paragraph 6 of the Assumption Agreement provides that nothing in the
agreement is intended to release or discharge A&J Gas or Anis Ahmed M.
Shaikh from their agreements with the plaintiff. In contrast,
Plaintiff's Exhibit 5 explicitly states that Mutual Oil has no
contractual relationship with Sana Adel, LLC.

In September 2018, the plaintiff filed the current lawsuit alleging breach of contract, violations of the Lanham Act, 15 U.S.C. §1114, et. Seq. and violations of the Trademark Dilution Revision Act of 2006, 15 U.S.C. §11051, et seq. Plaintiff's application for a prejudgment remedy ("PJR") is predicated on the breach of contract claims raised in Counts Four through Seven.

II. **STANDARD**

Rule 64(a) of the Federal Rules of Civil Procedure provides that in a federal civil action "every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." Fed. R. Civ. P. 64(a); *see also* <u>Novafund Advisors, LLC v. Capitala Group, LLC</u>, No. 3:18-cv-1023(MPS), 2019 WL 1438179, at *1 (D. Conn. Mar. 31, 2019). Thus, this Court must apply Connecticut's prejudgment remedy statute, Conn. Gen. Stat. §52-278a, *et seq*. Under that statute, a prejudgment remedy is available if the court finds "there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account any defenses, counterclaims or set-offs, will be rendered in favor of the plaintiff. . . ." Conn. Gen. Stat. §52-278d(a)(1).

At this stage, the "trial court's function is to determine whether there is probable cause to believe that a judgment will be rendered in favor of the plaintiff in a trial on the merits." Roberts v. Triplanet Partners, LLC, 950 F. Supp. 2d. 418, 421 (D. Conn. 2013) (quoting Balzer v. Millward, No. 3:10-cv-1740(SRU)(HBF), 2011 WL 1547211, at *1 (D. Conn. Apr. 21, 2011) (internal quotation marks omitted).  The court has "broad discretion to deny or grant a prejudgment remedy. . . ." State v. Ham, 253 Conn. 566, 568 (2000).

The probable cause standard is modest, and "not as demanding as proof by a fair preponderance of the evidence." TES Franchising LLC. v. Feldman, 286 Conn. 132, 137 (2008). "The legal idea of probable cause is a bona fide belief in the existence of facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence, and judgment, under the circumstances, in entertaining it."  Id.

A probable cause determination requires the court to determine "the validity of the plaintiff's claim and the amount of the remedy sought."  TES Franchising, LLC, 286 Conn. at 145-46; Conn. Gen. Stat. §52-278d(a).  In determining the amount of the remedy, "[d]amages need not be established with mathematical precision but must be based on evidence yielding a fair and reasonable estimate." Triplanet Partners, 950 F. Supp. 2d at 421 (citation and internal quotations omitted).

III. **LEGAL DISCUSSION**

The plaintiff argues that the defendants breached the
Branded Sales and Security Agreement in multiple ways and that
the plaintiff is entitled to recover four different categories
of damages: (1) lost profits in the amount of $103,106.40; (2)
the cost of petroleum that was delivered to the defendants but
never paid for, in the amount of $11,732.05; (3) reasonable
attorney's fees in the amount of $45,809.44; and (4) the
unamortized cost of the installed equipment in the amount of
$7,787.15. (Dkt. #48-1 at 4-5).

The Sales and Security Agreement provides that "the
interpretation and legal effect of [the] Agreement shall be
governed by the internal laws of the Commonwealth of
Massachusetts." (Plaintiff's Exh. 1, at ¶21). Therefore, the
Court will apply Massachusetts law to the substantive arguments
of the parties.[3]

Under Massachusetts law, "[t]o succeed in a breach of
contract action, a [plaintiff] must demonstrate (1) that the
parties reached a valid and binding agreement, (2) that one

---

[3] Prior to the PJR hearing both parties submitted briefs. The briefs
analyzed the contract claims under Connecticut law. (Dkt. #48-1 at
6-8; #55 at 5; #63 at 2-4). However, during the PJR hearing, the
defendants argued that the plaintiff cannot recover lost profits
because the agreement contains a choice of law clause which requires
the application of Massachusetts law and, under Massachusetts law,
lost profits are consequential damages that cannot be recovered. The
Court instructed the parties to file supplemental briefs on the issue.

party breached the terms of the agreement, and (3) that the other party suffered damages from the breach." Yellin & Hyman, P.C. v. James N. Ellis & Assocs., P.C., 2001 Mass. Super. LEXIS 232, at *10 (May 16, 2001). The parties agree that a valid and binding agreement was formed. However, they argue over what the agreement requires and whether it was breached.

A. Interpreting the Agreement

The plaintiff argues that the Branded Sales and Security Agreement requires the defendants to purchase nine million gallons of gasoline. In support of this conclusion, the plaintiff relies on paragraph two of the Addendum, which states that "[t]he term of the contract will be for ten (10) years or 9,000,000 gallons, whichever comes later." (Plaintiff's Exh. 2). The defendants disagree with this interpretation.

In their initial brief, the defendants argued that the "[p]laintiff's entire claim is predicated upon the theory that the required minimum purchase is 900,000 gallons per year." (Dkt. #55 at 4-5). Based on this assumption, the defendants argued that plaintiff's theory is inconsistent with the plain language of the agreement. (Dkt. #55 at 5). The agreement provides that the maximum quantity to be delivered to the defendants each month is 75,000 gallons of gasoline and the monthly minimum that the defendants are required to purchase is "90% of the maximum." The defendants argued that these monthly

requirements contradict plaintiff's theory that the defendants were required to buy a minimum of 900,000 gallons of gasoline per year.  (Dkt. #55 at 4; Plaintiff's Exh. 1, at p. 1).

In response, the plaintiff alerted the Court that the defendants had misstated the plaintiff's theory. (Dkt. #56 at 2).  The plaintiff contends that the agreement requires the defendants to purchase 9,000,000 gallons of gasoline but it does not require the defendants to purchase 75,000 gallons each month or 900,000 gallons each year.  (Dkt. #56 at 2).  Instead, the plaintiff contends that the defendants were required to purchase no less than ninety (90) percent of 75,000 gallons each month. (Dkt. #56 at 2).  Under plaintiff's construction, had the defendants purchased 75,000 gallons of gasoline each month (or 900,000 gallons each year), the defendants would have satisfied their obligation to purchase a total of 9,000,000 gallons within ten years but, if the defendants only purchased the monthly minimum (90% of 75,000 gallons each month, which equals 67,500 gallons per month), it would have taken more than ten years for the defendants to satisfy their obligation to purchase 9,000,000 gallons.  Therefore, plaintiff asserts that the defendants "did not have a set 'deadline' to meet their purchase obligations and

could satisfy [the] requirement beyond the fixed ten (10) year

term of the Branded Supply Agreement." (Dkt. #56 at 3).[4]

As the plaintiff notes, although page one of the Branded

Sales and Security Agreement provides that the term will run

from November 1, 2002 until October 31, 2012, page one of the

Sales Agreement annexed thereto states that the agreement "shall

automatically renew itself on a month to month basis and

continue in full force and effect…." (Plaintiff's Exh. 1, at 3).

The Addendum, which was signed on the very same day as the

Branded Sales and Security Agreement, further provides that "the

term of the contract will be for ten (10) years or 9,000,000

gallons, whichever comes later." (Plaintiff's Exh. 2, at ¶2).

The plaintiff argues that these provisions required the

defendants to purchase 9,000,000 gallons of gasoline but they

---

[4] In connection with the claim for damages, the defendants assert that paragraph 4 of the Sales Agreement explicitly provides the exclusive remedy for the failure to purchase the monthly minimum. (Dkt. #55 at 5). Paragraph 4 states that the plaintiff can either terminate the agreement or "reduce the volumes set forth on the Face Page by an amount applicable to reflect [the defendants'] actual purchases at the end of any twelve month period and said reduced volumes shall be substituted by the parties in lieu of the volumes set forth on the Front Page." (Dkt. #55 at 5). While Paragraph 4 indicates that the plaintiff could have modified the monthly requirements to reflect the defendants' actual purchases, paragraph 4 does not purport to relieve the defendants of their obligation to purchase a total of 9,000,000 gallons. Allowing the plaintiff to reduce the monthly requirements to reflect the actual amounts that the defendants were purchasing appears consistent with the notion that the agreement was for ten years or 9,000,000 gallons, whichever comes later. Reducing the monthly minimums would have increased the length of time it would have taken for the defendants to purchase the required 9,000,000 gallons.

were not required to purchase it within ten years. (Dkt. #56 at 3). Instead, under the plaintiff's theory, the defendants had the option of purchasing the 9,000,000 gallons during the ten year term or during any monthly renewals that followed the ten year term. (Dkt. #56 at 3). Plaintiff's theory is supported by paragraph 2 of the Addendum as well as the language in the Assumption Agreement which states that the agreements, including the Branded Sales and Security Agreement, "have an expiration date of October 31, 2012, or upon the purchase of 9,000,000 gallons of gasoline, whichever shall last occur." (Plaintiff's Exh. 4, at ¶1)(emphasis added).

Upon realizing that they had misstated plaintiff's theory, the defendants filed a sur-reply brief, arguing against the plaintiff's actual theory. (Dkt. #63). In the sur-reply brief, the defendants argue that the Addendum to the agreement contains terms or provisions that are not addressed in the Branded Sales and Security Agreement. (Dkt. #63 at 3). Thus, the defendants argue that the Addendum should be construed as adding new provisions and clarifying critical terms that are not explicitly addressed in the Branded Sales and Security Agreement. (Dkt. #63 at 3). In this respect, the defendants note that the Branded Sales and Security Agreement makes no specific reference to 9,000,000 gallons of gasoline. In contrast, the Addendum refers to 9,000,000 gallons. More specifically, when discussing the

costs of the dispensing equipment, paragraph 13 of the Addendum
states that the costs and installation of that equipment will be
amortized over 9,000,000 gallons.  Thus, the defendants argue
that the Court should conclude that paragraph 2 of the Addendum,
which provides for a term of ten years or 9,000,000 gallons, is
meant to apply to paragraph 13 of the Addendum. (Dkt. 63 at 3).
In other words, the defendants argue that the correct way to
interpret paragraph 2 of the Addendum is for it to mean that the
"defendants will have ten years or 9,000,000 gallons to pay off
the costs for the dispensing equipment and installation,
whichever is later." (Dkt. #63 at 3).

> When interpreting a contract under Massachusetts law,
>
> the plain language of  the contract controls,  without
> embellishment, unless  that language is  imprecise  or
> equivocal. Hubert v. Melrose-Wakefield Hosp. Ass'n, 40
> Mass. App. Ct. 172, 661 N.E.2d 1347, 1351 (1996). Only
> in the event of linguistic uncertainty may a court refer
> to antecedent negotiations as a method of clarifying the
> meaning of contractual terms.

Artuso v. Vertex Pharm., Inc., 637 F.3d 1, 7 (1st Cir. 2011).
see also Stewart v. O'Connor Const. Co., No. CIV. A. 01-3837,
2004 WL 2453322, at *2 (Mass. Super. Oct. 15, 2004)("The
interpretation of the language in a written contract is a
question of law for the Court, and if the words are plain and
free from ambiguity, they must be construed in accordance with
their ordinary meaning and usual sense.").  Under Massachusetts
law, a court must "construe the contract with reference to the

situation of the parties when they made it and to the objects sought to be accomplished." Starr v. Fordham, 420 Mass. 178, 190 (1995)(internal citations and quotations omitted). "[T]he scope of a party's obligations cannot be delineated by isolating words and interpreting them as though they stood alone.  Not only must due weight be accorded to the immediate context, but no part of the contract is to be disregarded." Id. (internal citations and quotations omitted).

Applying these principles to the facts, there is probable cause to believe that the trial court will adopt the plaintiff's construction of the agreement.  Plaintiff's construction is consistent with the plain language of the agreement and the objects that the parties sought to accomplish.  A person of ordinary caution, prudence and judgment, under the circumstances would entertain the plaintiff's interpretation. TES Franchising, LLC v. Feldman, 286 Conn. 132, 137 (2008).  Although the Branded Sales and Security Agreement states that it is for a "fixed term," the Addendum, which was negotiated on the very same day, is not necessarily in conflict with the fixed term.  Despite the defendants' argument to the contrary, paragraph 2 of the Addendum, when read in the proper context, can be read in harmony with the Branded Sales and Security Agreement's fixed term.  The plaintiff's construction gives meaning to the entire agreement without rendering any provisions meaningless.

The court's role at a PJR hearing "is to determine probable success by weighing probabilities" and the "weighing process applies to both legal and factual issues." Bank of Boston Connecticut v. Schlesinger, 220 Conn. 152, 156 (1991). After weighing the probabilities, the Court finds it more likely that the trial court will adopt the plaintiff's construction of the agreement.[5] It is difficult to reconcile the defendants' construction of the agreement with the plain language of the Assumption Agreement which, after specifically referencing the Branded Sales and Security Agreement and the Addendum, states that the defendants "will be bound by and assume all

_____

[5] Because the Court finds that there is probable cause to support plaintiff's construction of the agreement, the Court rejects the defendants' statute of limitations defense. The defendants argue that the agreement is a fixed term agreement, ending in 2012, and that under Connecticut law the statute of limitations for a breach of contract claim is six years. (Dkt. #55 at 9). The defendants argue that the term of the contract was ten years and since the defendants had not purchased 9,000,000 gallons by the end of the tenth year (October 31, 2012), the plaintiff was required to file suit within six years of October 31, 2012. However, since the Court has adopted plaintiff's construction of the agreement, the Court does not find probable cause for the statute of limitations defense. The defendants terminated the agreement in 2018 and as of that date, the defendants had not satisfied their obligation to purchase 9,000,000 gallons of gasoline. The defendants also argue that the plaintiff waived its right to enforce the agreement because, during the term of the agreement, the plaintiff never stated that the quantities that the defendants were purchasing were insufficient due to the monthly minimums set forth in the agreement. (Dkt. #55 at 9-10). However, the agreement contains a clause which expressly states that "[n]o waiver by either party of any breach of any of the covenants or conditions herein contained to be performed by the other party shall be construed as a waiver of any succeeding breach of the same or any other covenants or conditions." (Plaintiff's Exh. 1, p.4, at ¶20). As a result, the Court does not find probable cause for the waiver defense.

13

responsibility under <u>these agreements</u> acknowledging that the <u>agreements have an expiration date</u> of October 31, 2012, or upon the purchase of 9,000,000 gallons of gasoline, whichever shall last occur." (Plaintiff's Exh. 4, at ¶1)(emphasis added).

      B. <u>The Plaintiff Has Shown Probable Cause that the Defendants Have Breached the Agreement</u>

The evidence shows that the defendants stopped purchasing fuel from the plaintiff in 2018. During the hearing, the plaintiff produced evidence that when the defendants stopped purchasing fuel from the plaintiff, the defendants had purchased less than 9,000,000 gallons of gasoline. Plaintiff's witness, Neil Duffy, testified that the plaintiff has an internal invoice system, which includes certified data from Mutual Oil, that shows that the defendants only purchased 7,625,248 gallons, resulting in a shortfall of 1,374,752 gallons. Thus, there is probable cause that the plaintiff will be able to prove that the defendants have breached the agreement.

      C. <u>Damages</u>

The plaintiff must establish probable cause for the amount of the prejudgment remedy sought. Conn. Gen. Stat. §52-278(d). As stated above, the plaintiff has shown probable cause that the agreement required the defendants to purchase 9,000,000 gallons

of gasoline but fell short of the obligation by 1,374,752

gallons.[6]

Mr. Duffy testified as to how the plaintiff calculated its

damages for the shortfall.[7] Plaintiff is a subsidiary of 7-11.

Mr. Duffy testified that plaintiff's costs are determined by a

formula established between 7/11 and Citgo. The formula takes

90% of the Platts price for fuel (which is published daily),

adds 10% of the Platts price for the price of Ethanol (which is

published daily), and then subtracts 9% of the Platts price for

Renewable Identification Numbers (hereinafter "RINs").[8] *See also*

---

[6] The defendants argue that the monthly minimum only required the
defendants to purchase 90% of 75,000 gallons per month, which equals
67,500 gallons per month or 810,000 gallons per year. (Dkt. #55 at 6).
Since the defendants argue that the term of the agreement was ten
years, the defendants argue that the minimum amount of gasoline they
were required to purchase was 8,100,000 gallons (*i.e.*, 810,000 gallons
per year x 10 years). (Dkt. #55 at 6-7). Thus, the defendants argue
that if there was a shortfall, it was only 474,752 gallons. (Dkt. #55
at 7). Since the Court finds probable cause for the plaintiff's
construction of the agreement, which requires the defendants to buy
9,000,000 gallons, the Court rejects the defendants' argument.

[7] As stated in footnote 4 of this decision, the defendants argue that
paragraph 4 of the Sales Agreement provides the exclusive remedies
that are available to the plaintiff in the event of a breach.
However, paragraph 6 of the Security Agreement that is annexed to the
Branded Sales and Security Agreement states that if there is a default
in payment or the performance of any of the obligations or covenants
or liabilities by the defendants, the plaintiff may, "at its election,
declare the entire amount of the indebtedness then outstanding due and
payable at once." (Plaintiff's Exh. 1, p. 2, at ¶6).

[8] Platts is an assessment and reporting service that updates the prices
of fuel, Ethanol, and RINs on a daily basis, based on the market. The
plaintiff receives the Platts prices on a daily basis. Each day, the
plaintiff uses the previous day's Platts price. The Platts prices are
listed on pages 8 through 30 of Plaintiff's Exhibit 25.

Plaintiff's Exhibit 11, pp. 2-3.  Mr. Duffy testified that,
after computing a price under this formula, an "adder," which is
a negotiated figure, is included in the agreement.  Taxes are
also added to the formula depending on whether the federal
government has imposed taxes on the industry that year. The
formula generates the **fuel cost**, which is the amount Citgo
charges 7/11.

When selling fuel to its customers, plaintiff calculates
its margin on the sale by calculating the difference between the
**fuel cost** and the price that plaintiff's customers (such as the
defendants) pay for the fuel.  Under the plaintiff's agreement
with the defendants, the price that the defendants paid for fuel
was the "rack price" plus two cents per gallon.[9]  Mr. Duffy
testified that the plaintiff strictly adheres to this
calculation, even when it results in a loss to the plaintiff.

Plaintiff's Exhibit 25 is a lengthy and detailed document
which is regularly maintained in the plaintiff's computer
system.  Page 4 of Exhibit 25 contains the components of the
formula.  Pages 1 through 3 of Exhibit 25 itemize the fuel
shipments that were made to the defendants between February 10,
2015 and August 3, 2018.  Each line item on pages 1 through 3

---

[9] Plaintiff purchases fuel directly from Citgo, out of the primary
terminal in New Haven.  The "rack price" is a price that is set by
Citgo at the terminal each day, so it varies.

identifies the delivery date, invoice number, the number of gallons, the fuel price, the fuel cost, the margin, cents per gallon margin ("CPG Margin") and taxes. During the PJR hearing, Mr. Duffy testified at great length about the contents of Exhibit 25 and, while using specific examples on Exhibit 25, he explained how the formula operates.

The defendants argue that the plaintiff should only be able to recover 2 cents per gallon, because the Addendum "provides for a purchase price markup of 2 cents per gallon over the price paid by the plaintiff at the Citgo terminal in New Haven, Connecticut." (Dkt. #55 at 7). However, Mr. Duffy explained that the rack price is not what 7/11 pays Citgo. In other words, two cents per gallon is not plaintiff's profit. Instead, the rack price is set by Citgo at the terminal every day, while 7/11's costs are based on the formula above. Mr. Duffy testified that the average CPG margin between the fuel price and the **fuel cost** is 8.037 cents per gallon. (Exh. 25 p. 3).

At the PJR hearing, the defendants argued that the plaintiff cannot recover such damages at all. The defendants noted that paragraph 32 of the agreement states that "[n]o claim shall be made under this agreement for special or consequential damages except as otherwise provided by law." (Plaintiff's Exh.

1 at ¶32).[10]  The defendants argue that under Massachusetts law, lost profits are consequential damages, so the plaintiff cannot recover them in this case.  The Court instructed the parties to file post-hearing briefs on the newly raised issue. In response, each party filed a brief on August 22, 2019 (Dkt. #73 and 74) and the defendants filed a Reply Brief on August 29, 2019 (Dkt. #78).

In their briefs, the parties agree that the sale of gasoline is governed by the UCC.  The parties also agree that §2-708 of the Massachusetts UCC controls the measure of damages when a seller claims that the buyer has wrongfully rejected or revoked acceptance of goods or fails to make a payment due on or before delivery or repudiates the contract.  (Dkt. #73 at 3; #74 at 5).  Section 2-708 provides:

**(1)** Subject to subsection (2) and to the provisions of this Article with respect to proof of market price (Section 2-723), the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this Article (Section 2-710), but

---

[10] The plaintiff argues that paragraph 32 actually allows a party to recover consequential damages unless "otherwise provided by law." (Dkt. #73 at 3).  The Court disagrees with the plaintiff's reading of paragraph 32.  As the defendants argue, it appears more likely that the phrase "except as otherwise provided by law" is meant to apply if and when the state law prohibits clauses that bar consequential damages.  Massachusetts law does not prohibit such clauses. Deerskin Trading Post, Inc. v. Spencer Press, Inc., 398 Mass. 118, 121 (1986) ("[U]nder [the UCC], the recovery of consequential damages may be limited by agreement of the parties.").  However, given the Court's finding that the disputed damages are not consequential damages, paragraph 32 is academic.

less expenses saved in consequence of the buyer's breach.

**(2)** If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the <u>profit</u> (including reasonable overhead) <u>which the seller would have made from full performance by the buyer</u>, together with any incidental damages provided in this Article ( Section 2-710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

<u>Mass. Gen. Laws ch. 106, §2-708</u> (emphasis added).  Since UCC §2-708(2) specifically refers to lost profits, the defendants argue that the Court needs to determine if such lost profits are viewed as consequential damages because, if they are viewed as consequential damages, the plaintiff cannot recover them.  (Dkt. #74 at 4-6).

The defendants assert that "[t]he few reported Massachusetts cases that have had occasion to apply UCC §2-708(2) do not directly address the issue of whether lost profits are viewed as consequential damages."  (Dkt. #74 at 6).  Therefore, the defendants suggest that "[i]n the absence of controlling case law construing a seller's remedies under UCC §2-708(2), the Court should look to the analogous buyer's remedies under UCC §2-711, *et seq*." (Dkt. #74 at 6).  The defendants' assert that cases construing the buyers' remedies section of the UCC have consistently held that lost profits are consequential damages.  The defendants argue that "[t]here is

simply no logical basis for concluding that lost profits fall
into the category of consequential damages for buyers, while
adopting a different standard or definition for seller remedies
under UCC §2-708(2)." (Dkt. #74 at 7).

The defendants' argument suffers from a number of flaws.
First, it ignores the fact that there are reasons why the UCC
drafters created separate sections for buyer's remedies and
seller's remedies. *See* <u>Mass. Gen. Laws ch. 106, §2-708, 2-711
et. seq</u>.

> It is well established that under the Uniform Commercial
> Code, an aggrieved seller may not recover consequential
> damages incurred in connection with a resale of the goods
> following the buyer's breach. <u>In this regard, it is
> noteworthy that the Code omits, in the sections
> governing the remedies of the aggrieved seller, any
> counterpart to the Code provision which entitles the
> aggrieved buyer to consequential as well as incidental
> damages</u>.

Samuel Wiliston & Richard A. Lord, <u>A Treatise on the Law of
Contracts</u> §66:30 (Fourth Ed. 2002)(emphasis added).

Second, the defendants' attempt to characterize all "lost
profits" as consequential damages, ignores the distinction
between direct damages and consequential damages. "Direct
damages are those that arise naturally from the breach of the
contract itself, while consequential damages are those which
arise because of the intervention of special circumstances."
<u>Pentagram Software Corp. v. Voicetek Corp.</u>, No. 9200873, 1993 WL
818722, at *3 (Mass. Super. Nov. 18, 1993)(citing <u>Chestnut Hill</u>,

739 F. Supp. 692, 701 (D. Mass. 1990)). "[F]or a buyer, lost profits are a consequential damage whereas a seller's lost profit on 'the sale' under 2-708(2) [of the UCC] is 'direct.'" 1 White, Summers, & Hillman, Uniform Commercial Code § 7:21, at 588 (6th ed.). "It is the buyer who routinely suffers consequential damages arising out of undelivered or defective products (in the form of lost resale profits, personal injury, or worse.). Usually, a seller can be made whole via a resale recovery under 2-706 or one of the recoveries under 2-708 or 2-709." Id. § 8:29, at 742 (6th ed.).

In this case, the disputed damages are the profits that the plaintiff would have earned from selling gasoline directly to the defendants.  Plaintiff's lost profits arise naturally and directly from the defendants' breach.  In other words, they are direct damages, not consequential damages.[11]  Such damages are specifically authorized under UCC §2-708(2).[12]  In this respect, "[r]emedies under the Uniform Commercial Code are to be construed liberally so that the aggrieved party is placed in the

---

[11] The question of whether damages are consequential damages is a question of law for the court to decide. Chestnut Hill Dev. Corp. v. Otis Elevator Co., 739 F. Supp. 692, 701 (D. Mass. 1990).

[12] Under the UCC, a seller of goods cannot recover consequential damages.  Pentagram Software Corp., 1993 WL 818722, at *3. The fact that the drafters of the Massachusetts UCC included lost profits in the section that sets forth the remedies for sellers is further evidence that lost profits are not consequential damages for sellers.

same position as if the contract was performed." <u>Delano</u>
<u>Growers' Coop. Winery v. Supreme Wine Co.</u>, 393 Mass. 666, 678 n.
5 (1985). If the plaintiff is precluded from recovering the
amount it would have earned but for the breach, the plaintiff
would be deprived of an adequate remedy.

In this case, under UCC §2-708(1), the difference between
the market price and the unpaid contract price would be the
difference between the market price for fuel and the rack price
plus 2 cents, which is the price that the defendants were
charged. Mr. Duffy testified that the rack price plus 2 cents
stated in the agreement is negotiated between the plaintiff and
the defendants. The evidence shows that, unlike a seller of
widgets who may sell to another buyer at market price, the
plaintiff negotiates agreements with each of its gas stations
and the fuel price for each station is undetermined until that
time. Thus, under §2-708(1), the difference between the market
price, if one is even calculable given the circumstances, and
the unpaid contract price would be inadequate to place the
plaintiff in as good a position as performance would have done.
Therefore, UCC §2-708(2) allows the plaintiff to recover the
lost profits which it would have earned from full performance of
the agreement, together with incidental damages. <u>RGJ Assocs. v.</u>
<u>Stainsafe, Inc.</u>, 300 F. Supp. 2d 250, 251 (D. Mass. 2004).

Applying UCC §2-708(2), the plaintiff has established probable cause that it will recover the difference between the **fuel cost** and the fuel price.  As mentioned above, at this stage, "damages need not be established with precision but only on the basis of evidence yielding a fair and reasonable estimate."  Roberts v. Triplanet Partners, LLC, 950 F. Supp. 2d 418, 421 (D. Conn. 2013)(citation and internal quotations omitted); *see also* Rombola v. Cosindas, 351 Mass. 382, 385 (1966)("In determining the amount of damages to be awarded, mathematical accuracy of proof is not required.  The likelihood of prospective profits may be proved by an established earnings record.") (internal citations omitted).

Although the defendants argue that the lost profits are speculative in this instance, the Court disagrees.  Mr. Duffy's explanation of the profit calculation, along with the very detailed information contained in Exhibit 25, including a history of the defendants' purchases and plaintiff's profit, and the testimony regarding defendants' shortfall, are sufficient to establish a fair and reasonable estimate of plaintiff's damages.  Therefore, the Court finds probable cause for the amount of $103,106.40.[13]

---

[13] The actual costs per gallon margin is 8.037 cents per gallon but the plaintiff only requests 7.5 cents per gallon.  The figure of $103,106.40 was calculated using an average a 7.5 cents per gallon profit margin. Because the plaintiff has established probable cause

I.   Unpurchased, Delivered Petroleum

The plaintiff also seeks an attachment for damages related to fuel that was delivered to the defendants' gas station but for which no payment was made.  The plaintiff claims that in or about August of 2018, plaintiff delivered fuel which was sold to the defendants' customers.  The plaintiff claims that the defendants never paid for the delivery. (Dkt. #48-1 at 8).  The defendants argue that the plaintiff has not produced any invoices or delivery tickets to support the claim.  The Court finds that Mr. Sousa's testimony regarding the outstanding sum, along with Plaintiff's Exhibit 7, are sufficient at this stage to establish probable cause for that item of damages.

Citing Exhibit 7, Mr. Sousa testified that the defendants have an outstanding sum due for the delivery of the fuel, in the amount of $9,765.05.  Defendant Anis Ahmed M. Shaikh testified that his station continued to use Citgo fuel after the station was debranded.  While this is not conclusive evidence, it shows that the station was using Citgo fuel after the alleged delivery in August of 2018.  Mr. Sousa's testimony, Exhibit 7, and Anis Ahmed M. Shaikh's testimony are sufficient to establish probable cause for the amount of $9,765.05.

---

for a higher average CPG margin, the Court finds $103,106.40 to be reasonable.

The plaintiff also asks for an additional $1,967 for "costs associated with a Citgo equipment upgrade and a nonsufficient funds fee." (Dkt. #48-1 at 8). The plaintiff produced evidence of these amounts in the form of a repair invoice for $1,665.52, and a network service charge invoice for $102.00, both attached to the reply memorandum.[14] (Dkt. #56 at 6). The Court finds the invoices sufficiently establish probable cause for these costs, totaling $1,767.52 in costs. The plaintiff also requests a $200 fee associated with insufficient funds drawn on the defendants' accounts. However, the plaintiff failed to submit any evidence regarding the $200 fee. Therefore, the fee will not be included in the prejudgment remedy. When the amount of the unpurchased, delivered fuel ($9,765.05) is added to the costs associated with the upgrade ($1,767.52), the total amount is $11,532.57.

II. <u>Attorney's Fees</u>

The plaintiff also requests an attachment for reasonable attorney's fees in the amount of $45,809.44. (Dkt. #48-1 at 9).

Under Massachusetts law, courts may award attorney fees "pursuant to a valid contractual provision or stipulation." <u>Bournewood Hosp., Inc. v. Mass. Comm'n Against Discrimination</u>, 371 Mass. 303, 312 (1976). The operative agreement in this case includes an attorney fees provision, allowing the recovery of

---

[14] These invoices were directed to Sana Adel, LLC. Sana Adel, LLC. is no longer a defendant in this case. However, Plaintiff's Exhibit 5 shows that A&J Gas and Mr. Shaikh consented to having Sana Adel LLC act as their tenant.

reasonable attorney fees and costs incurred while enforcing any aspect of the agreement. (Plaintiff's Exh. 1 at ¶ 24). The defendants do not argue that the provision is invalid. Instead, the defendants argue that the plaintiff has not established probable cause for the breach of contract claims and, therefore, would not be able to recover attorney fees. As illustrated by the probable cause findings above, the Court disagrees.

Mr. Duffy testified that he reviewed the latest invoice from plaintiff's counsel and the current attorney fees and costs are over $80,000. This is also the figure that appears in Plaintiff's Exhibit 26, which was admitted into evidence over the defendants' objection. Despite this amount, the plaintiff has only requested $45,809.44 in attorney's fees, which the Court finds to be a reasonable number in relation to the fees that Mr. Duffy testified about during his direct examination.

"When attorney's fees are awarded, the amount is in the discretion of the trial judge." Cargill, Inc. v. Beaver Coal & Oil Co., 424 Mass. 356, 363 (1997). If the plaintiff prevails on it's contract claims at trial, the trial judge will need to determine the reasonable amount of attorney fees and costs. However, at this stage, the plaintiff has established probable cause for at least the requested amount of attorney fees. The Court finds there is probable cause to support plaintiff's

breach of contract claim, therefore finding probable cause to support an award of attorney fees in the amount of $45,809.44.

### III. Improper Debranding

Finally, the plaintiff requests an attachment for damages allegedly suffered due to the improper debranding of the gas station. The plaintiff argues that "the defendants' improper debranding of the premises resulted in monetary damages of $7,787.15 to [the plaintiff] representing the unamortized cost of the equipment installed by [the plaintiff]." (Dkt. #48-1 at 8). The plaintiff did not put on sufficient evidence to justify this figure. At the hearing, the plaintiff briefly mentioned plaintiff's Exhibit 24, which was never entered into evidence, and Mr. Sousa's affidavit. The plaintiff has not shown how the figure was calculated or how the debranding specifically caused harm in that amount. Therefore, the Court finds that the plaintiff has failed to establish probable cause for this amount. *See* Brooks v. Connor, 2006 Mass. App. Div. 13, 15 (2006)("To recover actual damages stemming from a breach of contract, the damages must be proved.").

### CONCLUSION

For the foregoing reasons, the plaintiff's motion for prejudgment remedy (Dkt. #48) is GRANTED in the amount of **$160,448.41**, which represents the sum of the lost profits,

**$103,106.40**, attorney's fees, **$45,809.44**, and unpurchased

petroleum products, **$11,532.57**.

This is not a recommended ruling. It is and has been the

rule in this district that an application for a prejudgment

remedy is considered non-dispositive. See <u>Lafarge Building</u>

<u>Materials, Inc. v. A. Aiudi & Sons, LLC</u>, No. 3:15CV1203(JBA),

2015 WL 6551796, at *8 n.19 (D. Conn. Oct. 29, 2015) (listing

cases). Therefore, this ruling is reviewable pursuant to the

"clearly erroneous" statutory standard of review. 28 U.S.C. §

636(b)(1)(A); Fed. R. Civ. P. 72(a); and D. Conn. L. R. 72.2. As

such, it is an order of the Court unless reversed or modified by

a district judge upon motion timely made. See 28 U.S.C. §

636(c)(3).

SO ORDERED this <u>13th</u> day of December 2019, at Hartford,

Connecticut.

_____/s/___ ___ _____
Robert A. Richardson
United States Magistrate Judge
